MARLA TAUSCHER, SBN 259630
225 S. Lake Ave., Ste. 300
Pasadena, California 91101
Phone:  (626) 345-5777
Fax:  (760) 444-2742
e-mail:  marla@attymat.com

LAURA J. PORTILLO, SBN 186813
Brinkman Portillo Ronk, APC
4333 Park Terrace Drive Ste. 205
Westlake Village, CA 91361
Telephone (818) 597-2992
Fax (818) 597-2998
e-mail: laura@brinkmanlaw.com

Attorneys for Plaintiff
Kimberly Stokes

# UNITED STATES DISTRICT COURT

## Eastern District of California

| | |
|---|---|
| KIMBERLY RENEE STOKES,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>CITY OF VISALIA,<br><br>　　　　　Defendant | Case No.: 1:17-at-00759<br><br>COMPLAINT FOR:<br><br>1.  Damages for Violation of 42 U.S.C. §1983;<br>2.  Injunctive Relief; and<br><br>**[Filed Concurrently with an EMERGENCY MOTION for Temporary Restraining Order to Prevent City of Visalia from Killing Plaintiff's Dog "Armani"]**<br><br>**REQUEST FOR JURY TRIAL** |

Kimberly Renee Stokes (hereinafter "Plaintiff" or "Stokes"), an individual, brings this action for: 1) Violation of 42 U.S.C §1983 and 2) Injunctive Relief;

***This is a civil action seeking to prevent the killing of Plaintiff's dog "Armani" by the City of Visalia Department of Animal Control on Tuesday, October 10, 2017.*** This action further seeks damages against defendants City of Visalia ("City") for committing acts under color of law, and depriving Stokes of rights secured by the Constitution of the United States and laws of the United States.

## JURISDICTION AND VENUE

1.     Defendant City deprived Plaintiff of her property without due process of law, thereby depriving Plaintiff of her rights, privileges and immunities as guaranteed by the Fourth and Fourteenth Amendments to the Constitution of the United States.

2.     The Court has jurisdiction of this action pursuant to 42 U.S.C. §1983 and 28 U.S.C §1343.

3.     The jurisdiction of this Court over this subject matter is further invoked pursuant to 28 U.S.C. §1331.

4.     Plaintiff is and was at all times mentioned herein citizens of the United States and of the State of California, City of Visalia.

5.     Defendant City was at all times material to this Complaint the entity responsible for the conduct of employees and agents of the City of Visalia Department of Animal Services ("Animal Control").

6.     At all times material to this Complaint, Defendant acted toward Plaintiff under color of the statutes, ordinances, customs, and usage of the State of California and the City of Visalia.

7.     Plaintiff is informed and believes, and based thereon alleges, that at all times relevant hereto, each of the individuals employed by or otherwise acting on behalf of the City of Visalia ("City") was the agent, servant, representative, joint venturer or employee of the City and in doing the things hereinafter alleged, each individual was acting within the course

1    and scope of said agency, servitude, representation, joint venture, or employment, with the

2    advance knowledge, permission, consent, acquiescence, authorization, direction or subsequent

3    ratification of the City.

4        8.    Plaintiff is ignorant of the true names and capacities of one or more defendants.

5    Plaintiff will amend this complaint to allege their true names and capacities when ascertained

6    by Plaintiff.

7        9.    This claim arose in the Eastern District of California.

8                              **FACTUAL BACKGROUND**

9        10.    **THE PURPOSE OF THIS ACTION IS TO PREVENT THE UNJUST**

10   **KILLING OF STOKES' DOG "ARMANI", WHICH IS CURRENTLY SET TO TAKE**

11   **PLACE ON TUESDAY, OCTOBER 10, 2017.**

12       11.    Plaintiff Stokes is the owner of a dog named "Armani" that she has owned for

13   approximately two years, since he was a puppy.

14       12.    At all times relevant, Plaintiff Stokes was living in the City of Visalia with

15   Armani and her two other dogs, "Gianni" and "Mademoiselle".

16       13.    Animal Control is the government agency responsible for enforcing laws related

17   to animals where Plaintiff resides within City of Visalia.

18       14.    On the morning of January 31, 2017, at approximately 8:00 a.m., a man named

19   Stephen Stewart ("Stewart") called Animal Control complaining that dogs belonging to his

20   neighbor, Stokes had attacked his two (2) dogs, "Andy" and "Jacko", when he was starting to

21   take them out for a walk that morning.

22       15.    Animal Control officer Murad Bayless ("Bayless") went to Stewart's residence

23   the same day and took a report of the incident, in which he cited statements made by two

24   neighbors, Darlene Martin ("Martin") and Guy Schiebelhut ("Schiebelhut"), that Bayless

25   indicated were eyewitnesses to the incident that morning.

26       16.    Stokes, who is a nurse and had been working the night shift the previous

27   evening, was inside her house asleep at the time of the incident.  She was alerted to it when her

28

---

COMPLAINT FOR VIOLATION OF 42 U.S.C. §1983

mother called her to tell her that a neighbor had called her mother to tell her that she thought two of Stokes' dogs were outside of her yard.

17.     In fact, Armani and Mademoiselle had found a weak plank in the fencing surrounding Stokes' backyard and crawled through a hole they made in the fence.  None of Stokes' dogs had ever escaped her fenced yard before, and they have not done so since that incident because Stokes made the necessary repairs to the fence immediately afterwards.

18.     When Stokes awoke, after her mother's phone call, she ran outside to see where her dogs were.

19.     Stokes saw Mademoiselle calmly sitting in the middle of the street.

20.     When Stokes saw Stewart's dog Andy running loose, she picked the dog up and went toward Stewart's house, and put Andy in Stewart's house.

21.     Stokes did not see what had happened, but when she went toward Stewart's house, she saw Armani sitting in Stewart's driveway, near the garage.

22.     She approached Stewart, whose hand was bleeding, and asked if he needed any help.  Stewart told Stokes to "Go away".  Stokes took Armani and Mademoiselle and returned to her home with them.

23.     Shortly thereafter, Bayless went to Stokes' house and seized her dogs, Armani and Mademoiselle, and impounded them at the Animal Control facility, where Armani remains to date.

24.     Bayless gave Stokes some documents (what he referred to in his report as a "vicious hearing packet"), one of which was an *Owner's Request for a Hearing ("Hearing Request"),* but did not provide any explanation of procedures for the conduct of a hearing or anything else.

25.     The *Hearing Request* required Stokes to agree to several statements on the form, one of which was, "I also agree that my submittal of this Request for Hearing must be accompanied by the hearing fee of $350.  Should the hearing fee not be included, I understand

that the request will be considered invalid and the City of Visalia will continue with the disposition of the animal(s) stated in section 6.16.070 [of the Visalia municipal code]."

26.    In other words, Stokes was required to pay $350 to exercise her constitutional right to a hearing to dispute a determination that her dogs were "vicious", which had already been declared by Animal Control.

27.    It is worth noting that there is no notice in the Visalia Municipal Code Chapter 6.16 regulating dangerous animals, or elsewhere, that provides for payment of a fee for a hearing to contest the determination that a person's animal is dangerous or vicious.

28.    An administrative hearing ("hearing") was convened on February 13, 2017. Stokes appeared with two witnesses, Kary Raven ("Raven") and Donald Brooks ("Brooks").

29.    A private attorney, Thomas E. Hornburg ("Hornburg"), had been hired (and paid) by the City to act in the capacity of hearing officer.

30.    Hornburg is regularly hired by the City to preside over administrative hearings.

31.    At the outset of the hearing, Hornburg informed the participants of the procedures to be employed in the conduct of the hearing:

    a.    That Stokes' dogs, *Armani and Madamoiselle, had already been deemed "vicious"* by Animal Control and should be killed, and that the purpose of the hearing was to appeal that determination;

    b.    That the *burden was on Stokes to convince Hornburg that her dogs were not vicious or dangerous;*

    c.    That the hearing would be conducted in an "informal" manner, in which the *rules of evidence did not apply*;

    d.    That Hornburg could *consider any evidence he personally deemed reasonably relevant, including hearsay (without any restriction that it supports direct evidence)*; and

e.   That there would be ***no cross-examination of witnesses***; all comments must be directed to Hornburg, not to any witnesses. Or as Hornburg said, "not by question/answer".

f.   Hornburg further stated that he was making an audio recording of the hearing, noting that he was not required to do so.

32.   After describing how he intended to conduct the hearing, Hornburg asked Stokes, "And what do you want to tell me?"

33.   Stokes recounted what she witnessed on the morning of January 31, 2017.

34.   Stokes also explained that she had repaired the fence around her backyard such that the dogs could no longer get out.

35.   Raven and Brooks "testified" about dog behavior generally, but neither had any first-hand knowledge of the events that led to the hearing.

36.   Neither Martin nor Shiebelhut appeared at the hearing to corroborate the statements attributed to them in Bayless's written report ("Report") and the *City of Visalia Animal Services Reports ("AC Reports")* prepared by him, dated January 31, 2017.

37.   In fact, four (4) *City of Visalia Animal Services Reports* completed by Bayless appeared in the administrative record, but were not at any time before or during the hearing made available to Stokes. Stokes did not see those reports until she obtained the administrative record well after the February 13, 2017 hearing.

38.   Stewart testified that he had just opened his garage door and was preparing to exit when he saw Stokes' dogs across the street from his house on the sidewalk.

39.   According to Stewart, he tried to take his dogs back in the house, but was knocked down by a dog, which he only described as a "big dog". Stewart then clarified that he did not know if the dog knocked him down, but that he was on the ground.

40.   Stewart stated that the big dog had grabbed his dog "Jacko" and that he had injured his hands "beating the shit out of the dog trying to get him to let go of my dog". When

asked by Hornburg, Stewart made clear that the dog had not tried to attack him and that his injuries were the result of him hitting the dog.

41.     Stewart stated that he twisted the dog's ears and he released Jacko, and he put Jacko in his house.

42.     Stewart said that the other "big dog" had his dog Andy, but did not elaborate as he had not seen what happened.  He said that, after he put Jacko in the house, he saw Stokes holding Andy.

43.     Stewart told Hornburg that he is "going to get a permit to carry a gun and if the dog does it again, I'm going to blow his goddam brains out."

*44.     Stewart then stated that two of Stokes' dogs had bitten his dogs a year earlier. He did not describe the dogs, or specify which dogs were involved and Hornburg did not ask him or otherwise request clarification of the incident.  This distinction is critical because Stokes had (and still has) three dogs as that time.*

45.     Stewart did not report that alleged incident to Animal Control or anyone else.

*46.     Stokes had no notice that anything other than the January 31, 2017 would be raised at the hearing, so she had no opportunity to prepare a defense or to adequately rebut Stewart's allegations of an incident a year earlier.*

47.     Stokes explained that there was an incident a year earlier, in which she had taken two of her dogs, who were both puppies at the time, out in the front yard to relieve themselves.

48.     Stokes stated that her dogs started across the street towards Stewart and his dogs, with her right behind them.

*49.     One of the dogs, which she mistakenly recalled at the time of the hearing was Armani (but later recalled was in fact her other dog, "Gianni"), had gotten a hold of the harness of one of Stewart's dogs but let go when Stokes took the dogs back home.*

*50.     Armani was not involved in the prior year, nor was he identified or described by Stewart at any time.  Stewart simply said that there were "two dogs".*

51.    At that time, Stokes assured Stewart that she would not allow her dogs outside without leashes and, to date, she has not allowed them outside without leashes.

52.    Stokes explained that she had taken remedial measures to prevent her dogs from escaping her yard, and detailed the repairs she had already made to her fence since January and the additional repairs that she was in the process of making, as well as the purchase of a kennel in which to house her dogs in the backyard when they are outside.

53.    Stokes also stated that she would seek professional training for her dogs to prevent any further incidents.

54.    *Jacko was not injured* in the January 31, 2017 incident.  *He was examined by a veterinarian that day and released without any treatment*.

55.    Stokes asked Stewart's wife for the veterinary bill and reimbursed the Stewarts the $282 for it on February 4, 2017.

56.    On February 14, 2017, Hornburg issued a written decision ("Decision") in which he concluded that Mademoiselle was not vicious and should be returned to Stokes with terms and conditions for her maintenance.

57.    Hornburg decided that Armani was vicious and sentenced him to death because, he wrote, that it was the "*second incident between the very same parties, that no remediation had occurred* after the first incident".

58.    In fact, *Stokes had remediated the situation* that led to the incident a year earlier.  As she stated, she had not allowed her dogs to be outside off-leash since then, which was not disputed by Stewart or anyone else.

59.    More importantly, *it was not the second incident for Armani*.  He had not been involved in the first incident.

60.    Stokes retained counsel, Thomas Degn ("Degn") shortly after receiving the Decision, who filed a petition for a writ of mandate pursuant to *Cal. Code of Civil Proc. §1094.5 et. seq.* on or about February 23, 2017 in the Superior Court of California, County of Tulare.

61.    On the advice of a friend, Stokes retained a different attorney, Ronald Calhoun ("Calhoun") in mid-April 2017.

62.    In early May 2017, Calhoun negotiated an agreement with the City, through its attorney, Leonard Herr ("Herr") by which the City would permit Stokes to have Armani evaluated by professional dog trainers, in exchange for Stokes' agreement to dismiss the pending writ petition in the Superior Court.

63.    Calhoun failed to adequately explain the agreement to Stokes, who understood it to mean that the writ petition would simply be stayed, not dismissed. ***Stokes believed that an additional administrative hearing would be convened at which she could clarify her erroneous statement about Armani's involvement in an incident that had occurred sometime the previous year*** and evaluations of Armani would be considered by Hornburg.

64.    Nonetheless, Calhoun filed a *Request for Dismissal* with prejudice on May 12, 2017 in the Superior Court, dismissing the writ action in its entirety.

65.    There was no additional administrative hearing.  Behavior assessments from Becky Holly and Alpha K9 Academy were submitted to Hornburg.  The conclusion of both assessments of Armani was that he is not aggressive after extensive interactions with Armani.

66.    The City exploited the agreement to introduce a sworn declaration by Animal Control supervisor Ivy Ruiz ("Ruiz") in which she made negative statements about Armani's behavior in spite of the fact that she has no qualifications as an expert in dog behavior and/or training.

67.    In her assessment, Ms. Holly specifically refuted the claims about Armani that y Ruiz made in her declaration.

68.    In light of the agreement Calhoun made with the City, and his failure to clearly explain to Stokes the implications of the agreement, Stokes terminated Calhoun after receiving Hornburg's second decision ("Second Decision") in late June 2017.

69.    Stokes then re-hired Degn to handle the situation with the writ petition botched by Calhoun.

70.   Degn filed a motion to set aside the dismissal which was ultimately granted and the writ petition was reinstated in early July 2017.

71.   The judge of the Superior Court declined to issue a writ at a hearing on September 28, 2017.

72.   **THE CITY HAS SET ARMANI'S EXECUTION FOR TUESDAY, OCTOBER 10, 2017.**

### The City Violated Stokes' Right to Due Process by Failing to Provide Notice of the Hearing and An Opportunity to Present Her Objections

73.   Dogs are considered property, and where a government entity seeks to deprive an owner of such property, the government's conduct must conform with due process requirements.

74.   Due process requires that, before a government takes an action that will adversely affect an interest in life, liberty or property, it must provide notice "notice reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Bourne Valley Court Trust v. Wells Fargo Bank, NA*, 832 F.3d 1154, 1158 (2016).

75.   The City of Visalia has devised a scheme whereby its Animal Control personnel determine whether a dog should be deemed dangerous or vicious without a hearing.

76.   Animal Control is permitted to make an immediate determination and condemn a dog to death five days after seizing the dog without an evidentiary or other hearing.

77.   Dog owners are required to request a hearing to try to overcome the "presumption of guilt" in order to spare their dogs' lives.

78.   The City has turned due process upside down by unilaterally determining that a dog is dangerous or vicious.  After such a determination, Animal Control is required to notify the owner of the determination and inform her that she has a right to an administrative hearing to review the determination.

79.     The City requires that a dog's owner to submit a form called *Owner's Request for Hearing* in order to challenge the determination.

80.     The City requires that the *Owner's Request for Hearing* be accompanied by payment of $350.  Without the payment, the *Request* will be considered invalid and the City will kill the owner's dog(s) five days after impound.

***81.     In other words, dog owners are required to pay a fee (a penalty) to exercise their constitutional right to challenge a government decision that adversely affects their right to life, liberty or property.***

82.     Where a hearing is convened, it is considered an appeal hearing by the City based on the determination made by Animal Control upon impound.

83.     Plaintiff was not provided with notice of a hearing at all, because the City of Visalia does not provide notice of administrative hearings.

84.     Plaintiff also was not provided with a notice of determination that either of her dogs had already been deemed dangerous or vicious by Animal Control and that the burden would be on her to rebut that presumption.

85.     A copy of Bayless's January 31, 2017 *Report* was posted on her front door.  In that *Report*, Bayless stated that he provided Plaintiff with what he called a "vicious hearing packet", but he failed to specify what was in that packet.

86.     Plaintiff submitted a completed *Request* and a hearing was scheduled for February 13, 2017.

87.     Due process requires an agency to provide reasons for its actions in sufficient detail that a person can prepare a responsive defense.  *K.W. ex rel. D.W. v. Armstrong*, 789 F.3d 962, 974 (2015).

88.     At the February 13, 2017, hearing, Stokes was blindsided by allegations made by Stewart of an incident a year earlier.  In fact, ***she misspoke and wrongly identified Armani as one of the dogs involved when it was really her other dog, Gianni.***

1      **89.      The distinction is critical, because Hornburg has sentenced Armani to death**

2  **based on the January 31, 2017 incident as a second incident.**

3      90.      Had Stokes been given adequate notice of the hearing, as required, she would

4  have been able to accurately recall the details of an event a year earlier, rather than try to

5  address them during a stressful hearing.

6      91.      At the hearing, Stokes was not given an opportunity to object to anything.   In

7  fact, Hornburg prohibited the hearing participants from addressing each other and specifically

8  instructed them to direct all comments to him, depriving Stokes of a meaningful opportunity to

9  object to anything Stewart said.

10  **The City Unlawfully Shifted the Burden of Proof to Stokes to Prove that Her Dogs are**

11  **Not Dangerous or Vicious**

12      92.      A State may regulate procedures for carrying out laws, unless in so doing it

13  offends a principle of justice considered fundamental.   *Speiser v. Randall*, 357 U.S. 513, 523-

14  524 (1958).   The presumption of innocence is a fundamental principle of the American justice

15  system.

16      93.      Under the City's ordinances, a dog is presumed to have done what was alleged

17  and sentenced to death within five (5) days, unless the dog's owner can pay $350 for a hearing

18  to try to prove that his/her dog is innocent.   The burden of proof is on the owner to prove her

19  dog's innocence.

20      94.      Such a shift in the burden of proof is contrary to the American system of justice.

21  It is not only unfair, but it penalizes dog owners by requiring them to pay $350 to exercise their

22  right to due process.   It discriminates against those who cannot afford to pay for a hearing.

23      95.      To make matters worse, the penalty for violation of the City ordinances

24  regulating dogs is a ***misdemeanor***.   As such, a dog owner could be criminally prosecuted under

25  the City ordinances based on an arbitrary determination by Animal Control that the owner's

26  dog is dangerous or vicious, without an opportunity to be heard.

27

28

96.     Stokes was not informed that her dogs had already been deemed dangerous or vicious, until Hornburg stated so at the hearing. Hornburg further informed Stokes that "the burden of proof is on you to convince me that these are not vicious or dangerous animals…"

97.     Hornburg did not cite any legal authority or define vicious or dangerous, despite the fact that the City ordinance does contain such definitions.  He indicated that his decision would be based on his subjective opinion and Stokes' ability to "convince" him, without further explanation.

98.     Such an unfair shifting of the burden of proof to Stokes resulted in a denial of her right to due process.  She was not given any information about what constituted a dangerous or vicious dog and how she could overcome the presumption that her dogs had already been determined to be dangerous or vicious.

99.     Any portion of Hornburg's Decision related to Armani that was based on uncontested testimony of Stewart should be considered invalid.

**The City Violated Stokes' Right to Due Process by Prohibiting Cross-Examination of Witnesses at the Hearing**

100.    Where government action seriously threatens a person, due process requires the government to make all evidence available to that person and to provide for cross-examination or adverse witnesses. *Kelly v. Herak*, 252 F.Supp. 289, 297 (1966).

101.    Indeed, the ***right to cross-examination*** during the City's hearing to appeal a dangerous/vicious dog determination has been codified in Visalia Municipal Code §6.16.050(B) which provides that, "The owner and animal control officer shall each have the right to call and examine witnesses; to introduce exhibits; to cross-examine opposing witnesses on any matter relevant to the issues at the hearing even though the matter was not covered in the direct examination…"

102.    Stokes was denied her right to cross-examine Stewart during the hearing because Hornburg expressly prohibited cross-examination.  At the outset of the hearing,

Hornburg instructed the participants not to speak across the table and to direct all comments to himself.

103.    Hornburg did not cite any authority or justification for his refusal to allow cross-examination of witnesses.

104.    Based on Stewart's testimony, there are issues that should have been clarified, which only could have been achieved by cross-examination of him.  For example, Stokes could have asked Stewart to describe the dog(s) that he alleged had come after his dogs a year earlier.  She could have asked what, if anything, precipitated the incident on January 31, 2017.

105.    In fact, the local ordinance require that the hearing officer consider a number of factors in determining whether to uphold a dangerous dog designation.  Visalia Municipal Code §6.16.050(D).  Among those is the presence or absence of any provocation.

106.    Stewart had made his hatred of Stokes' dogs very clear after the incident in 2016.  He had told Stokes that he did not want her dogs in his neighborhood.  It is possible that Stewart provoked Stokes' dogs on January 31, 2017.   Stokes was entitled to cross-examine Stewart on that and other issues.

107.    Hornburg should not have considered any testimony that was not subject to cross-examination.  Any such testimony should have been excluded and stricken from the record as consideration of it violated Stokes' right to due process.

**The City Violated Stokes' Right to Due Process by Failing to Provide an Unbiased, Impartial Adjudicator to Conduct the Hearing**

108.    A touchstone of due process is fundamental fairness.  The due process clause entitles a party to an impartial and disinterested tribunal.  The Constitution is not concerned with actual bias, but the appearance of injustice and whether a pecuniary interest in the outcome of a matter would be tempting to a reasonable person.  *Exxon Corp. v. Heinze*, 32 F.3d 1399, 1403 (1994)

109.    In *Haas v. County of San Bernardino* (2002) 27 Cal. 4th 1017, 1029, the Supreme Court of California ruled that a statutory scheme that permits local governments to

hire adjudicators on an ad hoc basis violates due process where an adjudicator may protect his own self-interest in future employment by issuing rulings favorable to the city/county.  Bias is presumed in such instances.

110.    In this case, the hearing officer, Hornburg, was selected and paid by the City. Hornburg is routinely hired by the City to preside over administrative hearings, which provides a financial incentive to him to decide matters in favor of the City, or risk losing future employment by the City.

111.    Hornburg stated at the outset of the hearing that he is a local attorney in private attorney who is hired by the City to act as hearing officer.  Hornburg is employed in that capacity routinely by the City and, therefore, has a pecuniary interest in the outcome of hearings regardless of the evidence.

112.    The temptation to issue rulings favorable to the City undoubtedly created a influenced Hornburg to decide Stokes' matter in a manner that justified the City's conduct. As such, Hornburg is not an impartial or unbiased adjudicator and his decision to uphold the designation that Armani is vicious cannot be considered valid.

113.    The City itself has a financial motive in rendering a decision against Stokes (and others similarly situated) because the City charges fees for "boarding" of impounded dogs during the adjudication of the matter.

114.    There is no legal authority for requiring periodic payments to prevent the killing of Stokes' dog for non-payment of those fees, but the City continues to demand payment.

115.    To date, Stokes has paid in excess of $5,000 to the City, which is akin to a penalty for exercising her constitutional right to appeal the determination that Armani is vicious or otherwise challenge the conduct of the City.

116.    Seizure and continued impound of Stokes' dog has produced a steady income stream for the City.  The City must not be permitted to demand payment of "boarding" fees during the pendency of this action.

**The City Violated Stokes' Right to Due Process by Permitting Ex Parte Communication Between Animal Control and Hornburg**

117.   Where ex parte contact with an adjudicator renders it impossible to fairly render a decision, or evidence is not made available for a person to rebut, that contact with an adjudicator threatens due process. *Vollmer v. Publishers Clearing House*, 248 F.3d 698, 710 (2001).

118.   During the hearing, no documentary or photographic evidence was provided to, or even shown to, Stokes.  Only after the hearing, when her attorney requested a copy of the administrative record from the City, did Stokes discover that Hornburg had possession of several photographs, police reports and other documents that were provided to him ex parte, either before or after the hearing.

119.   It is unclear exactly how Animal Control provided that evidence to Hornburg ex parte, and when, but the result was that Stokes was deprived of the opportunity to rebut any of the information contained in the records or to cross-examine Stewart or Bayless about it.

120.   That ex parte communication with Hornburg further deprived Stokes of her right to due process.

## FIRST CAUSE OF ACTION/CLAIM FOR RELIEF

### (Violation of 42 U.S.C. Section 1983)

121.   Plaintiff alleges and realleges by reference all of the allegations in the preceding paragraphs as if fully set forth herein.

122.   Defendant City of Visalia, by and through its Department of Animal Control, acting under color of State law, deprived Plaintiff of her dog "Armani", without due process of law, when it seized Armani January 31, 2017, deemed him vicious, and held a hearing that violated Stokes' right to due process in several respects as set forth in this Complaint.

123.   ***Animal Control plans to <u>kill Armani on Tuesday, October 10, 2017</u> based on a defective Decision.***

124.    During the commission of the above acts, all individuals working for the City were and are acting under color of California law.

125.    Defendant's flagrant disregard for due process has resulted in prolonged detention and a death sentence for Armani, and violation of Stokes' right to at the expense of Stokes who has been forced to pay over $5,000 in "boarding" fees to the City, which continues to demand approximately $500 per month during the pendency of legal action.

## SECOND CAUSE OF ACTION/CLAIM FOR RELIEF

### (Injunctive Relief)

**An Injunction Is Necessary To Prevent the Killing of Armani, Currently Scheduled for October 10, 2017**

126.    Plaintiff repeats, realleges and incorporates by reference all of the allegations in the preceding paragraphs as if fully set forth herein.

127.    Plaintiff is informed and believes, and based thereon alleges, that Defendant City is currently in possession of her dog Armani, who was seized from Plaintiff's home on January 31, 2017 and has been held by Animal Control since then, despite egregious violations of due process in the hearing that City uses as a pretext for continued detention of Armani.

128.    Plaintiff believes, based on the decision of Defendant City's agent, Hornburg, declaring Armani "vicious", that LAAS intends to kill Armani on October 10, 2017, which will permanently deprive Plaintiff of Armani.

129.    Unless Defendant City and their agents and assigns are prevented and enjoined from killing Plaintiff's dog, Plaintiff will continue to suffer irreparable harm.

WHEREFORE, Plaintiff requests:

1.      Injunctive relief to prevent Defendant City from killing Plaintiff's dog Armani during the pendency of this action;

2. Injunctive relief to prohibit City from demanding "boarding" fees on a monthly, or periodic, basis to prevent the killing of Armani, during the pendency of this action;

3. Invalidation of the decision by Hornburg with respect to Armani;

4. Compensatory damages in an amount to be determined;

5. Punitive damages in an amount to be determined

6. Attorney's fees, plus the costs of this action; and

7. Such other relief as to this Court seems just, proper, and equitable.

Dated:     October 9, 2017                        Respectfully Submitted,

                                        By: _____
                                            Marla Tauscher
                                            *Attorney for Plaintiff*
                                            *Kimberly Renee Stokes*